IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON


CRYSTAL ILESAMNI-WOODS          :

          Plaintiff,          :
                            Case No. 3:09CV0479
 vs.          :
                            District Judge Thomas M. Rose
MICHAEL J. ASTRUE,          :          Magistrate Judge Sharon L. Ovington
    Commissioner of the Social
    Security Administration,          :

          Defendant.          :


# REPORT AND RECOMMENDATIONS[1]


## I.          INTRODUCTION

Plaintiff Crystal Ilesamni-Woods sought financial assistance from the

Social Security Administration by applying for Supplemental Security Income

["SSI"] on June 24, 2004, and Disability Insurance Benefits ["DIB"] on July 2, 2004,

alleging disability since July 31, 2000.[2]  (Tr. 65-67, 850-52).  She claims to be

disabled by endometriosis and hypertension.  (Tr. 83).

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

[2]Plaintiff later amended her alleged disability onset date to February 23, 2004.  (Tr. 158).

After various administrative proceedings, Administrative Law Judge ["ALJ"] Thomas R. McNichols II denied Plaintiff's SSI and DIB applications based on his conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act. (Tr. 31-32). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. §405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #5), the Commissioner's Memorandum in Opposition (Doc. #8), Plaintiff's Reply (Doc. #9), the administrative record, and the record as a whole.

Plaintiff seeks a reversal of the ALJ's decision and remand for payment of benefits. The Commissioner seeks an Order affirming the ALJ's decision.

## II. BACKGROUND

Plaintiff was 36 years old at the time of the administrative decision, and thus was considered to be a "younger individual" for purposes of resolving her DIB and SSI claims. *See* 20 C.F.R. §§ 404.1563(c); 416.963(c);[3] (*see also* Tr. 30, 91). She has an 11th grade, limited education. *See* 20 C.F.R. § 416.964(b)(3); (*see also* Tr.

---

[3]The remaining citations will identify only the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations.

89).  Plaintiff has worked in the past as an activities coordinator and kitchen aide at a nursing home, a cashier/floor assistant, and a housekeeper.  (Tr. 84).

Plaintiff testified at the January 22, 2008, administrative hearing that she was in constant abdominal pain due to hernias and surgeries.  (Tr. 886-89, 894). Plaintiff also testified that she suffered from depression and did not want to leave her room.  (Tr. 889-90).  Her medication made her sleepy.  (Tr. 893).

Plaintiff estimated that she could walk only a few feet, stand for a few minutes, and sit for 10 to 15 minutes.  (Tr. 896).  Plaintiff testified that her doctor had restricted her to lifting no more than three pounds, and from doing household chores.  (Tr. 897-98).  She said that she spent most of her day in bed. (Tr. 901-02).

At a subsequent hearing on July 22, 2008, Plaintiff testified to the same conditions and limitations as at the first hearing.  (Tr. 917-42).

Turning to the remaining information in the administrative record, the most significant evidence for purposes of the present case consists of Plaintiff's medical records,[4] which are summarized as follows.

---

[4]Because resolution of the issues presented in this case does not involve the vocational expert testimony presented at the administrative hearing, that testimony is not summarized here.

**Robert Hunter, D.O.**

The record contains treatment notes from Dr. Hunter, Plaintiff's primary care physician, dated August 30, 2004, to August 13, 2007.  (Tr. 449-53, 497-513, 617-50, 661-64, 673-75).  Plaintiff was treated for abdominal pain, fatigue, and ventral hernia (Tr. 497-98, 500, 502-06, 508-13); a kidney stone (Tr. 501); anxiety (Tr. 618, 630, 632, 634); GERD, hypertension, and Epstein-Barr Syndrome.  (Tr. 619, 621-624, 629-630, 632, 634, 640, 644, 646, 648).  Her treatment included pain medication.  (Tr. 627-38, 641-46).

Dr. Hunter 's medical records attendant completed a Basic Medical form on January 28, 2005.  (Tr. 452-53).  This form states that Plaintiff could stand/walk and sit for one hour out of eight, and for 30 minutes at a time. Plaintiff was extremely limited in her ability to push/pull, bend and perform repetitive foot movements.  She was markedly impaired in her ability to reach. She was moderately limited in her ability to handle, and was not significantly limited in her ability to see, hear or speak.  (Tr. 452).  Plaintiff was termed unemployable.  This opinion reportedly was based on Dr. Hunter's examinations, hospital test records, and a consultation report by Dr. Gabriel.  (Tr. 453).  The form was not signed by Dr. Hunter.

On April 27, 2005, Dr. Hunter's office completed interrogatories stated that Plaintiff's problems began in 2000. (Tr. 449-51). She also had problems with a non-healing abdominal wound in 2004. Plaintiff was treated for abdominal pain, anxiety, depression, asthma, fatigue, and a kidney stone. (Tr. 450). Dr. Hunter's signature also does not appear on this form.

Dr. Hunter reported on December 20, 2006, that Plaintiff was not able to perform full-time work duties on a continuing basis, and cited her history of abdominal pain and hernia repairs. (Tr. 591).

On August 13, 2007, Dr. Hunter terminated Plaintiff as his patient because she was receiving pain medications from more than one doctor. (Tr. 662, 674).

**Andrew L. Archer, D.O.**

Dr. Archer, a surgeon, examined Plaintiff in August 2006, and recommended surgery to address her complaints of abdominal pain. (Tr. 588). Plaintiff had surgery in September 2006 to remove adhesions and a mesh. (Tr. 526-46). Following surgery, Dr. Archer indicated that Plaintiff was doing "fairly well" with "no complaints," but had a seroma that required drainage. (Tr. 581-82, 587). Fluid was drained from Plaintiff's abdomen twice in October 2006. (Tr. 579, 583). Also that month, Plaintiff underwent a procedure to remove a mesh and to drain a seroma. (Tr. 555). Plaintiff later went to the emergency room

complaining that her incision had opened, and the wound was re-closed. (Tr. 557-65). In November 2006, Plaintiff had abdominal wall fluid drained. (Tr. 578). Plaintiff had surgery in December 2006, to drain a seroma and for placement of drains. (Tr. 589-90).

In January 2007, Dr. Archer drained fluid from Plaintiff's abdomen and planned a procedure to remove fluid from her abdominal wall. (Tr. 653-54, 682-86). On January 24, 2007, Dr. Archer reported that Plaintiff was progressing well and could resume normal activities. (Tr. 652). Plaintiff went to the emergency room on January 30, 2007, for an infected postoperative seroma. (Tr. 592-95). Plaintiff returned to the emergency room with abdominal pain and vomiting in February 2007. (Tr. 725-30). On February 27, 2007, Dr. Archer reported that Plaintiff was progressing well and could resume normal activities. (Tr. 651). In April 2007, a CT scan showed a possible small abscess, inflammatory changes and separation of certain abdominal muscles. (Tr. 663-64). Plaintiff underwent an incisional herniorrhaphy with mesh and laparotomy with lysis of adhesions on September 11, 2007. (Tr. 666, 668, 740-741, 796-797). She was cleared to resume activities and with a 25 pound lifting restriction. (Tr. 666).

A CT scan taken in April 2008 due to complaints of left lower abdomen pain revealed fluid collection in her anterior abdomen wall. A CT-guided

drainage procedure was recommended (Tr. 817-18), and an ultrasound-guided drainage of Plaintiff's abdominal wall seroma was done on May 13, 2008.  (Tr. 832).

### Damian M. Danopulos, M.D.

On March 3, 2008, after the first hearing, Dr. Danopulos examined Plaintiff on behalf of the Ohio Bureau of Disability Determination ["BDD"].  (Tr. 798-816). Plaintiff reported that she had her first ingrown hernia when she was nine.  (Tr. 799).  She has had 10 to 12 endometriosis surgeries, 20 abdominal hernia surgeries, and four umbilical surgeries.  (Tr. 800).  Examination revealed that her entire lower abdomen wall was tender and painful.  (Tr. 801).  Dr. Danopulos opined that Plaintiff's ability to do work-related activities was restricted due to her constant lower abdominal pain and obesity.  (Tr. 803).  According to Dr. Danopulos, Plaintiff could lift 10 pounds frequently and 20 pounds occasionally; sit for seven hours in a work day for one hour at a time; stand/walk for one hour each out of eight hours for 30 minutes at a time each; reach frequently; push/pull occasionally; operate foot controls occasionally; frequently climb stairs and ramps; occasionally stoop and kneel; never crouch, crawl or climb ladders or scaffolds; tolerate frequent exposure to vibrations and humidity/wetness; and tolerate occasional exposure to hazards, heights, motor vehicles, respiratory

irritants, and temperature extremes. (Tr. 809-14). Dr. Danopulos concluded that Plaintiff's pain resulted from adhesions from previous abdominal surgeries, seromas and abdominal wall abscesses. (Tr. 814). Any forced motion or environmental changes could intensify that pain, which was treated with narcotic patches. (*Id.*)

**Jerry Flexman, Ph.D.**

Consulting neuropsychologist Dr. Flexman examined Plaintiff on behalf of the Ohio BDD on November 20, 2004. (Tr. 430-33). Plaintiff reported that she had chronic pain as a result of endometriosis. She had dropped out of school because she didn't like it. She reported past childhood sexual abuse. Plaintiff spent most of her day lying down and watching television. (Tr. 430). Plaintiff also reported that she used the microwave for food, cleaned house, went grocery shopping three or four times a month, and visited with her friends and family. Although Plaintiff's mental status exam was normal, Dr. Flexman judged her attention span to be poor. Plaintiff was also judged to be unmotivated. (Tr. 431). He opined that Plaintiff was significantly malingering based on her response style. He also found that her obsessive thinking about her somatic and psychological problems was out of proportion with reality. (Tr. 432). Dr. Flexman diagnosed her with somatoform disorder and malingering, and

assigned her a Global Assessment of Functioning ["GAF"] score of 60. (*Id.*). He opined that Plaintiff had no limitations in her ability to understand, remember and carry out short, simple instructions; to make work-related judgments; or in attention or concentration; and slight limitations in social interaction and her ability to respond to changes in the workplace or the pressure of work. (Tr. 433).

### R. Kevin Goeke, Ph.D.

Dr. Goeke reviewed the record for the Ohio BDD on January 3, 2005. (Tr. 434-46). He opined that Plaintiff had only mild limitations in her activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence or pace. (Tr. 434-44). He agreed with Dr. Flexman's conclusions. (Tr. 445).

State agency psychologist Alice L. Chambly, Psy.D., affirmed Dr. Goeke's opinion in May 2005. (Tr. 434).

### Shirlann Knight, M.D.

On May 7, 2007, Plaintiff saw Dr. Knight, a psychiatrist, with complaints of depression and panic attacks. (Tr. 600-03). Dr. Knight diagnosed Plaintiff with bipolar disorder, most recent episode mixed, severe with psychotic features, and rule out panic disorder. She assigned Plaintiff a GAF score of 45, and prescribed

medication. (Tr. 602).  Plaintiff saw Dr. Knight four times through December

2007.  (Tr. 596-99, 676-81).

Dr. Knight completed interrogatories on January 28, 2008.  (Tr. 766-74).

Plaintiff's diagnoses included bipolar, mixed with severe psychosis and auditory

hallucinations, and r/o anxiety disorder.  (Tr. 767).  Dr. Knight indicated that the

combined effects of Plaintiff's mental and physical impairments were more than

the sum of the parts.  (*Id.*).  She also noted that chronic physical pain, drainage

tubes and hernia complications would add to an individual's depression.  (Tr.

768).  Dr. Knight opined that Plaintiff had difficulty with concentration

("distracted by internal stimuli") and focus.  (*Id.*). Dr. Knight further opined that

Plaintiff could not be prompt and regular in attendance; withstand the pressure

of meeting normal standards of work productivity and work standards; sustain

attention and concentration; understand, remember, and carry out work

instructions; behave in an emotionally stable manner; relate predictably in social

situations; demonstrate reliability; maintain attention and concentration for

extended periods; perform activities within a schedule, maintain regular

attendance, and be punctual; complete a normal workday or workweek without

interruption from psychologically and/or physically based symptoms; respond

appropriately to changes in a routine setting; get along with co-workers or peers

without unduly distracting them; or sustain ordinary routine without special supervision; work in coordination with others; and sometimes, accept instructions and respond appropriately to criticism from supervisors. (Tr. 769-74).

## III.  THE "DISABILITY" REQUIREMENT & ADMINISTRATIVE REVIEW

### A.  <u>Applicable Standards</u>

To be eligible for SSI or DIB, a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  The definition of "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See id*.  A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  (*See* Tr. 22-23); *see also* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.   Is the claimant engaged in substantial gainful activity?

2.   Does the claimant suffer from one or more severe impairments?

3.   Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.   Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.   Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

**B.     The ALJ's Decision**

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31,

2008, and had not engaged in substantial gainful activity since February 23, 2004. (Tr. 23).

The ALJ found at Step 2 that Plaintiff has the severe impairments of chronic abdominal pain, obesity, depression and a somatoform disorder.  (*Id.*). The ALJ determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that meets or equals the level of severity described in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 26).

At Step 4, the ALJ found that Plaintiff retained the residual functional capacity ["RFC"] to perform sedentary work subject to: 1) standing and/or walking no more than two hours per eight-hour work day; 2) occasional stooping or kneeling; 3) occasional pushing or pulling; 4) no bending, crouching, crawling, or twisting at the waist; 5) no more than occasional exposure to irritants, temperature extremes or humidity; 6) frequent climbing of stairs but no climbing of ropes, ladders, or scaffolds; 7) no more than occasional exposure to hazards; 8) occasional driving; 9) low stress jobs with no production quotas; and 9) no requirement to maintain concentration on a single task for longer than 15 minutes at a time.  (Tr. 28).  The ALJ further found that Plaintiff is unable to perform her past relevant work as a kitchen aide, front desk clerk, activities coordinator, or telemarketer.  (Tr. 30).  Nevertheless, relying on the VE testimony, the ALJ found

that Plaintiff can perform a number of jobs that exist in representative numbers in the national economy.  (Tr. 31).  This assessment, along with the ALJ's findings throughout his sequential evaluation, led him ultimately to conclude that Plaintiff was not under a disability and hence not eligible for SSI or DIB.  (Tr. 31-32).

## IV.  JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are to be upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . ." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r. of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r. of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    DISCUSSION

### A.    **The Parties' Contentions**

Plaintiff argues that the ALJ erred in his evaluation of the medical source opinions.  Specifically, Plaintiff contends that the ALJ erred in rejecting the opinions of her treating physician, Dr. Hunter, and her treating psychiatrist, Dr. Knight, in favor of the opinions of Dr. Danopulos, the state agency consulting physician; Dr. Flexman, the consulting psychologist, and the state agency reviewing psychologists.  (Doc. # 5 at 13).

Plaintiff urges that the ALJ's errors in these regards mandate a reversal of the ALJ's decision and an award of benefits. (*Id.* at 20).

Noting that the ALJ made an RFC finding even more restrictive than that suggested by Dr. Danopulos (Doc. # 8 at 12), Defendant argues that the ALJ's decision and analysis show that he carefully considered the evidence of Plaintiff's surgical history and her complaints of pain. (*Id.* at 13). The Commissioner urges that the ALJ evaluated Plaintiff's allegations of a disabling mental impairment consistent with the regulations. (*Id.* at 14).

### B. Medical Source Opinions

#### 1. *Treating Medical Sources*

The treating physician rule, when applicable, requires an ALJ to give controlling weight to a treating physician's or treating psychologist's opinion rather than favoring the opinion of a non-examining medical advisor or a one-time examining physician or psychologist, or a medical advisor who testified before the ALJ. *Blakley,* 581 F.3d at 406; *see Wilson*, 378 F.3d at 544. A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. (*Id.*).

-16-

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

More weight generally is given to the opinions of examining medical sources than to those of non-examining medical sources. *See* 20 C.F.R. § 416.927(d)(1). But the opinions of non-examining state agency medical consultants have some value, and under some circumstances, can be given significant weight. *See* 20 C.F.R. § 404.927(d), (f); *see also* Ruling 96-6p at *2-*3.

### 2. *Non-Treating Medical Sources*

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180, at *2. Still, the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source. *See id*. at *2-*3. The Regulations explain that "[i]n deciding whether you are disabled,

we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."  20 C.F.R. § 416.927(b).  To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 416.927(d) including, at a minium, the factors of supportability, consistency, and specialization.  *See* 20 C.F.R. § 416.927(f); *see also* Ruling 96-6p at *2-*3.

### C.  Analysis

An ALJ must weigh the record evidence, including medical source opinions, to determine whether a claimant is under a "disability."  *See* 20 U.S.C. § 416.927(e).  The ALJ's decision in Plaintiff's case reveals that he did weigh the medical source opinions and other evidence of record in accordance with the required legal criteria, and reasonably concluded that Plaintiff was not under a "disability" as defined by the Social Security Act.

The ALJ properly rejected treating physician Dr. Hunter's "broad, cursory opinion" that Plaintiff could not perform full-time work due to chronic abdominal pain and hernia repairs, because that conclusion went "to the ultimate issue of disability, which is reserved to the Commissioner."  (Tr. 29).  The regulations expressly provide that in cases decided through an administrative hearing, the responsibility for deciding a claimant's RFC rests with the ALJ.  *See*

*Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (citations omitted); *see also* 20 C.F.R. §§ 416.946; 416.927(e)(2).  The ALJ thus was not required to accept Dr. Hunter's conclusions as to that ultimate issue.

In addition, the ALJ found that Dr. Hunter did not support his opinions with objective medical evidence or treatment history, and that the record also lacked other evidence corroborating his conclusions.  (Tr. 29); *see* 20 C.F.R. § 416.927(d)(2)-(4).  A review of Dr. Hunter's opinions confirms the reasonableness of the ALJ's decision in this regard, as Dr. Hunter did not explain his disability conclusions in any meaningful detail.  (*See* Tr. 591).  The ALJ also correctly observed that Dr. Hunter's opinion was contradicted by that of treating surgeon Dr. Archer (Tr. 29), who stated numerous times that Plaintiff's surgical results were generally good (*see* Tr. 581-82, 587, 651, 652), and who recommended that Plaintiff resume normal activities upon discharge from his care.  (Tr. 652, 666). The ALJ further noted that Dr. Hunter's opinion was inconsistent with the "detailed physical examination findings" of examining physician Dr. Danopulos. (Tr. 29).  Substantial evidence thus supports the ALJ's reasons for not fully crediting the treating physician's opinions.

Based on the ALJ's consideration of the record evidence as a whole, he also reasonably concluded that Plaintiff was capable of performing a range of

sedentary work activities consistent with the limitations set forth in the opinion provided by Dr. Danopulos. (Tr. 809-14). The ALJ reasonably relied on Dr. Danopulos' opinion as he believed that opinion best reflected an evaluation of the record evidence as a whole and accounted for Plaintiff's credible limitations. (Tr. 29-30). Indeed, while Dr. Danopulos estimated that Plaintiff could lift at a light strength range, the ALJ made an even more restrictive RFC finding, limiting Plaintiff to lifting at a sedentary level of no more than 10 pounds, in order to put even less stress on her abdominal wall. (Tr. 29). Given the Court's limited role on review, *see Rogers*, 486 F.3d at 241; *Blakley*, 581 F.3d at 407, this Court cannot say that ALJ McNichols erred in his evaluation of the medical source evidence regarding Plaintiff's physical limitations.

In determining Plaintiff's mental RFC, the ALJ also considered all relevant evidence of record and reasonably determined that Plaintiff was limited to low stress jobs with no production quotas, and could not maintain concentration on a single task for longer than 15 minutes at a time. (Tr. 28). Contrary to Plaintiff's contentions (Doc. #5 at 18), the ALJ did not err in making these determinations by relying on the opinions of Drs. Flexman, Goeke, and Chambly. (*See* Tr. 27-28, 430-33, 434-46). The ALJ noted that Dr. Flexman consultatively examined Plaintiff and identified only "slight" limitations (Tr. 433), which allowed Plaintiff

to perform low stress jobs with no production quotas and without maintaining

concentration on a single task for longer than 15 minutes at a time.  (Tr. 28). Also,

the ALJ observed that the state agency psychologists concluded that Plaintiff's

mental problems were not severe.  (*See* Tr. 434, 445).  *See* Social Security Ruling

96-6p ("State agency medical and psychological consultant are highly qualified

physicians and psychologists who are experts in the evaluation of the medical

issues in disability claims under the [Social Security] Act.").  Those medical

source opinions provided adequate support for the ALJ's RFC assessment.  20

C.F.R. § 416.927(d), (f)(2)(I).

Although Plaintiff further contends that the ALJ should have adopted the

opinion of treating psychiatrist Dr. Knight (Doc. #5 at 18-19), substantial evidence

supports the ALJ's decision not to accord controlling or significant weight to Dr.

Knight's opinions.  As the Commissioner aptly notes (*see* Doc. #8 at 15), Dr.

Knight offered an extreme opinion indicating that Plaintiff had no ability to

complete a wide variety of work-related mental functions.  (*See* Tr. 27, 769-74).

The ALJ reasonably determined that Dr. Knight's own treatment notes did not

support her conclusions in that regard, indicating that Plaintiff's depression

improved when she was compliant with therapy.  (Tr. 27-28).  He further noted

that the treatment notes of another treating physician, Dr. Nwokoro, contradicted

Dr. Knight's conclusions by reflecting that Plaintiff "showed no depression or anxiety." (Tr. 28). Further undermining Dr. Knight's opinion, her treatment notes show that Plaintiff did better with medication and worse when she was out of medication. (Tr. 25, 596-99, 676-81).

The ALJ bears ultimate responsibility for assessing a claimant's RFC, taking into consideration the opinions of medical sources and other relevant evidence. *See* 20 C.F.R. §§ 416.927(e), 416.945. In this case, the ALJ was faced with inconsistent and contradictory evidence. On the one hand, Drs. Hunter and Knight opined that Plaintiff was unable to perform even sedentary work. On the other hand, Drs. Danopulos, Flexman, Goeke and Chambly opined that Plaintiff was not so limited. In determining Plaintiff's RFC, the ALJ acknowledged these extremes and reasonably devised an RFC for a limited range of sedentary work. The ALJ took into consideration all of the medical evidence of record and reasonably accommodated Plaintiff's impairments by limiting Plaintiff to a range of sedentary work. (Tr. 28-30). It is the ALJ's function to resolve inconsistencies and conflicts in the medical evidence, *see King* v. *Heckler,* 742 F.2d 968, 974 (6th Cir. 1984), and the record reveals that the ALJ considered all of the relevant medical evidence in assessing Plaintiff's RFC.

Accordingly, Plaintiff's challenges to the ALJ's nondisability determination lack merit.

**IT THEREFORE IS RECOMMENDED THAT:**

1.    The Commissioner's non-disability finding be AFFIRMED; and

2.    The case be TERMINATED on the docket of this Court.


November 29, 2010                              s/Sharon L. Ovington
                                                        Sharon L. Ovington
                                            United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen [14] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen [17] days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen [14] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).